UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

JOSEPHER Y. CARTAGENA

No. 3:20-CR-00261 (MPS)

**RULING ON MOTION TO SUPPRESS**

On December 16, 2020, then-Magistrate Judge Sarah A. L. Merriam issued an arrest warrant for Josepher Y. Cartagena based on a criminal complaint charging transport of a stolen vehicle in violation of 18 U.S.C. § 2312. A few days later, a grand jury returned an Indictment charging Cartagena with one count of conspiring to transport and possess stolen vehicles, in violation of 18 U.S.C. § 371, two counts of transporting stolen vehicles, in violation of 18 U.S.C. § 2312, and two counts of possessing stolen vehicles, in violation of 18 U.S.C. § 2313. When the warrant was issued, law enforcement officers did not know Cartagena's whereabouts. They found him by identifying a girlfriend with whom he lived, locating his girlfriend's vehicle, and finding what they believed to be his and his girlfriend's residence in the Bronx. After observing Cartagena leave that residence, officers followed him and later attempted and failed to apprehend him. While Cartagena was on the run, officers returned to the residence, entered without a search warrant, and saw in plain view evidence of criminal conduct. They then applied for a search warrant using that evidence, and a Magistrate Judge issued the warrant. Cartagena moves to suppress all the evidence seized by the investigators pursuant to the search warrant, arguing that the initial, warrantless entry rendered the search warrant invalid. For the reasons below, I deny Cartagena's motion to suppress.

I.  **FACTUAL BACKGROUND**

The facts set forth below are undisputed and are taken from Task Force Officer ("TFO") Matthew Hancock's Affidavit submitted in support of the search warrant application, ECF No. 141-4, and a related report by agents of the Federal Bureau of Investigation ("FBI"), ECF No. 147-1.

On December 16, 2020, then-Magistrate Judge Merriam issued an arrest warrant for Cartagena based on a criminal complaint charging violations of 18 U.S.C. § 2312.  ECF No. 141-4 ¶ 10; *see* ECF No. 2.  On December 22, 2020, a grand jury returned an Indictment charging Cartagena with one count of conspiring to transport and possess stolen vehicles in violation of 18 U.S.C. § 371, two counts of transporting stolen vehicles in violation of 18 U.S.C. § 2312, and two counts of possessing stolen vehicles in violation of 18 U.S.C. ¶ 2313.  ECF No. 141-4 ¶ 10; *see* ECF No. 5.  The Indictment alleged that Cartagena and co-conspirators stole vehicles and/or transported them across state lines on July 28, 2020, July 29, 2020, and July 31, 2020.  *Id.* at 2–3.

Leading up to and after the issuance of the arrest warrant, law enforcement officers pursued leads attempting to locate Cartagena.  ECF No. 141-4 ¶ 13.  During the investigation, officers identified "TM" as Cartagena's girlfriend and believed that TM and Cartagena lived together at an unknown address.  *Id.*  Officers then contacted TM's parents, who reported "that they were in regular communication with TM and that TM had stated she was living with [Cartagena]."  *Id.*  TM's mother also "heard [Cartagena's] voice in the background when speaking with TM on the phone."  *Id.*  TM's parents stated that TM had "moved in with Cartagena after a falling out with her father" and "would not provide her address to [them]."  *Id.*

On December 23, 2020 at 9:00 AM, TFO James Menton located a Volkswagen Jetta that was registered to TM in front of 1477 Astor Avenue in Bronx, New York by using license plate reader technology.  ECF No. 147-1 at 2; ECF No. 147 at 5 n.2.  Officers initiated surveillance in

the vicinity of the Jetta and observed TM walking from 1478 Astor Avenue and entering her Jetta. 147-1 at 2. Officers then observed TM drive to, enter, and exit various stores. *Id.* At about 1:20 PM, TFO Enzo Baia observed Cartagena leave "the basement apartment of 1478 Astor Avenue and enter a gray Toyota RAV4." *Id.* Officers followed the Toyota, awaiting additional units to initiate a vehicle stop. *Id.* At 1:50 PM, TFO Menton saw the Toyota double parked with the motor running across from 534 Morris Park Avenue in the Bronx, New York. *Id.*[1] TFO Menton attempted to box in the Toyota by parking in front of it and exited his vehicle to apprehend Cartagena. *Id.* Cartagena escaped by driving the Toyota onto the sidewalk. *Id.* Officers followed Cartagena, and Cartagena continued to evade them, refusing to comply with the officers' commands, steering his vehicle at an officer at one point, and driving recklessly. *Id.* at 2–3. During the pursuit, Cartagena left his by-then-damaged Toyota at a gas station and fled in a black Jeep Grand Cherokee, which he drove into oncoming traffic. *Id.* at 3. Officers eventually stopped pursuing Cartagena, returned to the gas station, and recovered a gun in a small black bag dropped by Cartagena and two cell phones—one on the ground outside of the Toyota and one on the floor of the Toyota's driver seat. *Id.* at 3–4.

After Cartagena escaped, officers decided to return to 1478 Astor Avenue based on the "reasonable belief that [Cartagena], who [was] subject to the outstanding arrest warrants and resides [there], may have returned there." ECF No. 141-4 ¶ 17; *see also* ECF No. 147-1 at 4. At 3:30 PM, officers "knocked and announced their presence at 1478 Astor Avenue," and "[a]fter a reasonable period of time passed, entry was made into the residence" without a search warrant. *Id.*; *see also* ECF No. 141-4 ¶ 17. Upon entry, officers observed "in plain view … hundreds of

---

[1] A Google Maps search indicates that 534 Morris Park Avenue is 2.2 miles and a 12-minute drive from 1478 Astor Avenue; the two locations are separated by the Bronx and Pelham Parkway, the Albert Einstein College of Medicine, and over two dozen city blocks.

3

unopened cell phone boxes and other electronic devices." ECF No. 147-1 at 4. Officers searched for Cartagena at the residence but he was not there. *Id.* Two officers remained at the residence waiting for a search warrant. *Id.*

TFO Matthew Hancock subsequently submitted an Affidavit in support of the application for a search warrant for Floor 1 of 1478 Astor Avenue and the two recovered cellphones. ECF No. 141-4 ¶¶ 3–5. He averred that he was "familiar with the facts and circumstances of this investigation from [his] own participation in the investigation, [his] review of documents, [his] training and experience," and his discussions with other law enforcement officers. *Id.* ¶ 2.

In the affidavit, TFO Hancock provided background information on the FBI's investigation of "a group of individuals who … [had] been conducting coordinated burglaries of new-car dealerships and mobile phone stores in Connecticut, New York, and elsewhere." *Id.* ¶ 9. The FBI suspected the group in "the theft of over 40 vehicles in Connecticut, New York, and elsewhere … and the theft of hundreds of thousands of dollars' worth of phones and phone accessories." *Id.* Cartagena "is an alleged member of this group," and the Indictment had charged him with offenses resulting from this investigation. *Id.* ¶ 10. TFO Hancock stated that Magistrate Judge Merriam had issued an arrest warrant for Cartagena. *Id.* In addition to the offenses charged in the Indictment, Hancock averred that there was also "probable cause" that Cartagena stole phones from an AT&T store in Guilford, Connecticut on July 29, 2020. *Id.* ¶ 11. Specifically, officers matched the DNA found in a broken latex glove fingertip left at the AT&T store to Cartagena, and security camera footage showed Cartagena wearing the same gloves. *Id.*

TFO Hancock described the officers' efforts to locate Cartagena by identifying TM as Cartagena's girlfriend, talking to TM's parents, who stated that TM lived with Cartagena, conducting surveillance in the Bronx, observing TM and Cartagena leaving 1478 Astor Avenue

at different times, and following Cartagena after he left in a Toyota RAV4. *Id.* ¶ 13–14. He then described the officers' attempt to apprehend Cartagena and his subsequent escape. *Id.* ¶¶ 15–16. TFO Hancock stated that Cartagena "remain[ed] at large." *Id.* ¶ 13. TFO Hancock explained in the warrant affidavit that, after the pursuit, officers returned to the Subject Premises and "forced entry into [1478 Astor Avenue] without a search warrant in the reasonable belief that [Cartagena], who [was] subject to outstanding arrest warrants and reside[d] at the … [dwelling], may have returned there." *Id.* ¶ 17.

TFO Hancock averred that "[l]aw enforcement reasonably believed that stolen property and other evidence" of the offenses might be found at 1478 Astor Avenue due to the "volume of stolen property" allegedly stolen by Cartagena and his coconspirators. *Id.* ¶ 18. He stated that law enforcement suspected that Cartagena and his coconspirators stole "hundreds of thousands of dollars' worth of phone and phone accessories." *Id.* During the July 29, 2020 burglary of the AT&T store, Cartagena allegedly stole over $20,000 in phones. *Id.* In another burglary on December 11, 2020, Cartagena or his coconspirators allegedly stole over $200,000 in phone and phone accessories from a Verizon store in Westport, Connecticut. *Id.*

TFO Hancock also averred that law enforcement "reasonably believed that stolen property and other evidence of the … [o]ffenses … may be destroyed by [Cartagena] or others absent immediate entry into and security of [1478 Astor Avenue], particularly in light of [Cartagena's] encounter with law enforcement shortly beforehand." *Id.* Further, TFO Hancock stated that "since [Cartagena] … dropped a firearm during his earlier encounter with law enforcement, law enforcement believed that additional weapons may be located at [1478 Astor Avenue] and that [Cartagena] or others may access those weapons in response to [Cartagena's] flight." *Id.* ¶ 19.

In the Affidavit, TFO Hancock included three photographs of the interior of the residence and stated that the law enforcement observed, "in plain view, … substantial numbers of phones, phone accessories, electronics, and other merchandise believed to have been stolen by Cartagena or his alleged coconspirators." *Id.* ¶ 20.  TFO Hancock averred that "[b]ased on [his] training, experience, and participation in this investigation, and what [he] observed in plain view in the [residence at 1478 Astor Avenue]… there [was] probable cause to believe that the search [of] the [residence] may contain evidence of the … [o]ffenses" including, evidence of (1) the occupancy of the residence, (2) transportation and possession of stolen vehicles, (3) transportation and possession of stolen property, (4) financial proceeds of the alleged offenses, (5) identities of Cartagena's coconspirators, (6) writings related to the alleged offenses, and (7) cellphones.  *Id.* ¶ 21.  Magistrate Judge Barbara Moses of the U.S. District Court for the Southern District of New York issued the search warrant on December 23, 2020.  *Id.* at 14.

Law enforcement ultimately apprehended and arrested Cartagena on December 23, 2020 at 9:30 PM after multiple attempts involving high-speed evasions by him in various vehicles. ECF No. 147-1 at 4–6.

## II.     DISCUSSION

Cartagena moves to suppress all evidence seized from 1478 Astor Avenue arguing that the initial, warrantless entry rendered the subsequent search warrant invalid.  ECF No. 141-2 at 1; ECF No. 141-2 at 1–2.[2]  The Government argues that the motion to suppress should be denied because "(1) the arrest warrant for Cartagena authorized entry into his residence, (2) exigent circumstances justified entry without a search warrant, (3) the search warrant … is valid even

---

[2] Cartagena also suggests that all evidence seized "prior to the issuance" of the search warrant should be suppressed.  ECF No. 141-1 at 1.  However, there is no indication that the officers seized any evidence during the initial, warrantless entry.  Instead, TFO Hancock included photographs of items observed during the initial, warrantless entry in the affidavit for the search warrant application.  ECF No. 141-4 ¶ 20.

without the evidence obtained from the warrantless entry, and (4) officers' reliance on the search was objectively reasonable." ECF No. 147 at 9. The parties do not dispute that the officers had a valid arrest warrant for Cartagena and that the officers initially entered 1478 Astor Avenue without a search warrant. Because I find that the officers had a reasonable belief that Cartagena lived at the Subject Premises and was present at the time of their entry, and because the officers' reliance on the search warrant was in any event objectively reasonable, I deny Cartagena's motion to suppress.

### A. *Execution of the Arrest Warrant for Cartagena*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. Although the Supreme Court has construed the Amendment to prohibit entry into a home without a search warrant, with a few narrow exceptions, *see, e.g., Lange v. California*, 141 S. Ct. 2011, 2017 (2021), "[g]enerally, the police do not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect." *United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995). This is so because "once an arrest warrant for a particular suspect has issued, it is constitutionally reasonable to require him to open his doors to the officers of the law." *Id.* (internal quotation marks omitted). So "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). "Agents may enter a suspect's residence, or what they have *reason to believe* is his residence, in order to effectuate an arrest warrant where a *reasonable belief* exists that the suspect is present." *Lauter*, 57 F.3d at 214 (emphasis added).

"[R]eason to believe to is not a particularly high standard," *United States v. Bohannon*, 824 F.3d 242, 257, 255 (2d Cir. 2016), and is less demanding than probable cause, *see Lauter*, 57 F.3d at 215. "[R]eason to believe … require[s] specific and articulable facts that, taken together with rational inferences drawn therefrom, provide a particularized and objective basis for thinking that the arrest-warrant subject may be present within specific premises." *Bohannon*, 824 F.3d 242, 255 (2d Cir. 2016) (borrowing from the "reasonable suspicion" standard from *Terry* stops but noting that the two standards are not the same). Officers do not need to "conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence." *United States v. Terry*, 702 F.2d. 299, 319 (2d Cir. 1983). Instead, "officers may rely on common-sense assumptions about human behavior to support a reasonable belief." *United States v. Canada*, 858 F. App'x 436, 443 (2d Cir. 2021) (summary order). "[T]he officers' belief, if reasonable, [does not need to] be correct." *United States v. Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999). "In assessing reasonableness, [a court] view[s] the facts 'in their totality and in a commonsense manner,' … remaining mindful of the 'factual and practical considerations of everyday life' in evaluating a record for reasonable belief." *Canada*, 858 F. App'x at 442 (quoting *Bohannon*, 824 F.3d at 255).

The issue here is whether the officers, armed with a valid arrest warrant, had reason to believe that Cartagena lived and was present at 1478 Astor Avenue when they entered the dwelling to execute the arrest warrant. If the officers had such a reasonable belief, then their entry was lawful and they properly used the evidence observed in plain view in their search warrant application. *See Terry*, 702 F.2d at 319 (finding that once the officers were lawfully on the premises executing a valid arrest warrant, "the agents were entitled to make a limited security check of the premises" and seize items in plain view). Based on the totality of the

circumstances, I conclude that the officers had reason to believe that Cartagena (1) lived at 1478 Astor Avenue, and (2) was present at the time of entry.

First, the officers easily had reason to believe (and even probable cause, if that were required) that Cartagena lived at 1478 Astor Avenue, and Cartagena all but concedes this point. ECF No. 141-2 at 2 (noting that the officers "had reliable information that defendant lived [at 1478 Astor Avenue]"). The officers had identified TM as Cartagena's girlfriend and contacted TM's parents, who informed them that TM lived with Cartagena at an unknown address. ECF No. 141-4 ¶ 13. Specifically, TM's parents said that TM told them that "she was living with [Cartagena]," and TM's mother heard Cartagena's voice in the background while speaking with TM on the phone. *Id.* The officers then located TM's Jetta parked in front of 1477 Astor Avenue and observed TM "walking from 1478 Astor Avenue" to her Jetta. ECF No. 147-1 at 2. A few hours later, an officer observed Cartagena "exit[ing] the basement apartment of 1478 Astor Avenue." *Id.* These facts—TM's telling her parents that she lived with Cartagena, the officers' finding TM's car parked nearby 1478 Astor Avenue, and their observing first TM and later Cartagena exit the home at that address—plainly "provide a particularized and objective basis for thinking" that Cartagena lived at 1478 Astor Avenue.

Second, the officers had reason to believe that Cartagena was present at 1478 Astor Avenue when they entered the dwelling to execute the arrest warrant. After he left the dwelling at 1:20 PM, the officers followed him and first sought to apprehend him at a location miles away at 1:50 PM. ECF No. 147-1 at 2; *see* note 1, *supra*. Thus, the officers had reason to believe that Cartagena was unaware that they knew that he was living at 1478 Astor Avenue, as they had not alerted him to their presence until they were far removed from that location. There is no evidence in the record that Cartagena was aware that the officers were investigating him, knew

where he lived with TM, or were following him before they first attempted to corral him in a separate part of the Bronx—and Cartagena does not contend that there is. After the officers attempted to apprehend Cartagena, he escaped, triggering a wild, lengthy pursuit during which he dropped his gun and his cell phones. ECF No. 147-1 at 2–4; ECF No. 141-4 ¶¶ 15–16. Officers then stopped pursuing Cartagena and returned to 1478 Astor Avenue. ECF No. 147-1 at 4; ECF No. 141-4 ¶ 17. At 3:30 PM, they knocked, announced their presence, and entered after a "reasonable period of time passed." ECF No. 147-1 at 4. The lack of response to the officers' knock did not necessarily suggest that no one was present because "it [is] reasonable to expect a fugitive to hide or flee if possible." *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995). And given the recklessness Cartagena displayed during his flight, combined with his dropping of the gun and cell phones, the officers' belief, as reported in Hancock's Affidavit, "that additional weapons may be located [at 1478 Astor Avenue] and that Cartagena or others may access those weapons in response to Cartagena's flight," ECF No. 141-4 ¶ 19, was also reasonable. Cartagena's obvious desire to avoid apprehension and his demonstrated willingness to take great risks to do so during the initial chase made the possibility that he would stop by his residence to re-arm himself and pick up a new cell phone, the better to continue his evasion of law enforcement authorities, at least a realistic prospect. In short, when considering the facts available to them and the tense circumstances following the reckless flight of Cartagena, I find that the officers had reason to believe that Cartagena "might be within" the residence at 1478 Astor Avenue, *Bohannon*, 824 F.3d at 256, having potentially returned to hide, obtain another phone or gun, remove or destroy evidence, or take other actions to evade apprehension.

Cartagena argues that no officers were "left behind to secure the [1478 Astor Avenue]" to determine whether anyone was present, ECF No. 141-2 at 2, but this fact works against him,

because it means that the officers did not know whether he had returned.  Indeed, this circumstance suggests that this case presents a more compelling instance of "reasonable belief" about a suspect's presence than the situation in *Canada*, 858 F. App'x at 442–43, where the Second Circuit affirmed the district court's finding of "reasonable belief" even though law enforcement officers had surveilled the suspect's residence and not seen him return in the hours after he left.  *See id.* at 442–44 (affirming denial of suppression motion where agents knew from their review of video footage that suspect had left the apartment hours before they entered and, from stakeout positions, did not see him return, because there had been a short gap in surveillance and defendant may have learned of co-defendants' arrests earlier that day).  Law enforcement  officers do not need to "prove with certainty that the subject of an arrest warrant is at home."  *Canada*, 858 F. App'x at 443; *Terry*, 702 F.2d at 319 (holding that the police do not have to "conduct a thorough investigation to obtain evidence of an arrestee's actual presence before entering his residence").  Officers only need to "rely on common-sense assumptions about human behavior to support a reasonable belief" that Cartagena was present.  *Canada*, 858 F. App'x at 443.

I conclude that the officers had reason to believe that Cartagena lived at and was present at 1478 Astor Avenue when they entered the dwelling to execute the arrest warrant.  Their entry was thus lawful, and the evidence they observed in "plain view" during their sweep was properly used in their search warrant application.[3]  *Terry*, 702 F.3d at 319.

### B. *Good-Faith Exception*

Even if the officers did not have "reason to believe" Cartagena was present at the time of their entry, I would deny the motion to suppress under the good-faith exception to the

---

[3] Cartagena does not argue that the evidence does not qualify for the plain view exception nor that the sweep of 1478 Astor Avenue was improper.

11

exclusionary rule.  "A violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010).  "[E]vidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion and will not be suppressed." *United States v. Eldred*, 933 F.3d 110, 118 (2d Cir. 2019) (internal quotation marks and citation omitted).  "The good-faith exception … holds that when the agents executing a search warrant act with an objectively reasonable good-faith belief that their conduct is lawful, improperly obtained evidence remains admissible because in such circumstances, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (internal quotation marks and citation omitted).  However, the good-faith exception does not apply in four circumstances: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)).  "These exceptions reflect the general rule that, '[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *United States v. Romain*, 678 F. App'x 23, 25 (2d Cir. 2017) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)).  "The pertinent analysis of deterrence and culpability is objective," and a court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances." *Rosa*, 626 F.3d at 64 (internal quotation marks and citation omitted).

The good-faith exception applies here because, even if the search warrant was invalid, the officers acted "in objectively reasonable reliance" on that warrant and none of the four circumstances described above apply. First, there is no evidence that Magistrate Judge Moses was "knowingly misled." To the contrary, the Affidavit discloses that the officers' initial entry into 1478 Astor Avenue was warrantless, *id.* ¶ 17, and that the evidence in paragraph 20 was derived from that entry, *id.* ¶ 20. Second, there is no evidence that Magistrate Judge Moses "wholly abandoned her judicial role." Third, there is no evidence that the Affidavit is "so lacking in indicia of probable cause as to render reliance upon it unreasonable." The fourteen-page Affidavit is not "bare bones," *Clark*, 638 F.3d at 103, as it sufficiently describes the arrest warrant for Cartagena, the FBI's investigation, the officers' attempt to apprehend Cartagena, the officers' reasons for returning to 1478 Astor Avenue, and the allegedly stolen electronics found in 1478 Astor Avenue, *see* ECF No. 141-4. When considering the evidence from the initial entry, ECF No. 141-4 ¶ 20, along with the rest of the Affidavit, the Affidavit plainly provides probable cause "that a crime was committed … and … that evidence of such crime is located at the residence," *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). And even if the initial entry was unlawful, then the issue becomes not whether the Affidavit still supports a finding of probable cause without the evidence from that entry but, rather, whether it was "objectively reasonable" for the officers to rely on Magistrate Judge Moses's determination that there was probable cause. *See United States v. Rocha-Gomez*, 412 F. Supp. 3d 369, 378–79 (S.D.N.Y. 2019) ("[A] probable cause determination [that] might have been in error is insufficient to render the good-faith exception inapplicable."); *United States v. Buck*, 813 F.2d 588, 593 (2d Cir. 1987) ("The exclusionary rule's deterrent function is not served by penalizing officers who rely upon the objectively reasonable legal conclusions of an issuing judge."). Here,

13

the officers disclosed to Magistrate Judge Moses that they entered 1478 Astor Avenue without a warrant and identified the specific evidence gained from that entry. ECF No. 141-4 ¶¶ 14, 20. Because the officers did not conceal the nature of their initial entry or how it affected the Affidavit, I assume that Magistrate Judge Moses took account of that information and concluded, as I have, that she could consider the evidence obtained from the initial entry because the entry was supported by the officers' reasonable belief that Cartagena was present—or else concluded that the affidavit was sufficient to support probable cause even without the evidence obtained from the illegal entry. Even if she was wrong on either count (and I have already concluded she was correct on the first count), the issue of whether there was reasonable belief—or whether there was probable cause without the evidence from the initial entry—is, at best for Cartagena, a close one and one that the officers reasonably submitted to the Court to decide. It follows that they acted reasonably in relying on the legal guidance Magistrate Judge Moses provided by issuing the warrant. Finally, there is no evidence that the "warrant is so facially deficient that reliance upon it is unreasonable."

I conclude that even if the search warrant was invalid, it was "objectively reasonable" for the officers to rely on that warrant.

### III.   CONCLUSION

For the reasons above, the motion to suppress (ECF No. 141) is DENIED. Because I find that the officers had a reasonable belief that Cartagena lived at 1478 Astor Avenue and was present at the time of their entry, and because the officers' reliance on the search warrant was in any event objectively reasonable, I need not address whether there were exigent circumstances or whether the search warrant supported a finding of probable cause without the evidence obtained from the warrantless entry.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
January 10, 2022